STATE OF MAINE

KNOX, ss.

STATE OF MAINE
Knox. S.S., Clerks Office
SUPERIOR COURT

JUL 20 2004

RECEIVED AND FILED
Susan Guillette, Clerk

SUPERIOR COURT
CIVIL ACTION
DOCKET NOS. AP-03-006 &
AP-03-019

BARBARA A. LEWIS and
SALIM B. LEWIS,

     Plaintiffs

     v.

THE INHABITANTS OF THE
TOWN OF ROCKPORT, MAINE,

     Defendant

     and

MARSHA L. STEINGLASS and
VICTOR J. STEINGLASS,

     Parties-in-Interest

**DECISION AND ORDER**

*************************************************

BARBARA A. LEWIS and
SALIM B. LEWIS,

     Plaintiffs

     v.

THE INHABITANTS OF THE
TOWN OF ROCKPORT, MAINE,
and THOMAS FORD, in his
capacity as Code Enforcement
Officer for the Town of
Rockport, Maine,

     and

MARSHA L. STEINGLASS and
VICTOR J. STEINGLASS,

     Parties-in-Interest

## I.     Introduction.

This matter is before the court on the consolidated appeals[1] of Barbara A. and Salim B.  Lewis (collectively "Lewises") who appeal from the actions of the  Rockport Zoning Board of Appeals ("ZBA" or "board") in granting a variance and permits to Marsha L. and Victor J. Steinglass (collectively "Steinglasses") which permit the latter to move and improve their residence in Rockport.

In AP-03-006, the Lewises appeal the ZBA's grant of a variance under Rockport's Floodplain Management Ordinance ("FMO") which would allow the Steinglasses to move their home to a higher elevation in the floodplain but still below the flood elevation specified in the FMO.  The variance would also allow the Steinglasses to improve this structure by more than 50% of its current market value when sited at the new elevation.[2]

In AP-03-019, the Lewises appeal the ZBA's decision to uphold the Code Enforcement Officer's ("CEO") issuance of a building permit (permit no. 1429) and a flood hazard development permit (permit no. 1430) which would allow the Steinglasses to relocate and improve their residence at its new site.

### A.     Facts and Procedural History.

While the parties differ as to characterizations of the facts in this case, they are not seriously disputed and may be repeated here along with the procedural history of the disagreements between them as to the development of the Steinglasses' property on Rockport Harbor.

---

[1] The cases were never formally consolidated but the court does so on its own initiative as the parties, the property at issue, and the attorneys are the same in both cases.  Moreover, the facts and issues in the two cases overlap and the record contains references to events common to each case.  The cases were also argued together.

[2] In neither AP-03-006 nor AP-03-019 has the Town of Rockport taken an active role.  It has simply advised the court that it joins in the Steinglasses' briefs except their arguments concerning the Lewises' standing to prosecute these appeals.

The Steinglasses have lived on the property at issue since 1973. At that time, there was a residential structure and an old boathouse on the lot, the latter sitting directly on the shore of Rockport Harbor, approximately 10 1/2 feet vertical elevation above sea level at the boathouse's lowest point. In 1975, the Steinglasses moved into the boathouse which has since served as their residence. Thereafter, in 1981, they divided the property and sold the portion with the residence to the Lewises in 1986. The Lewises' property therefore then, and now, abuts the Steinglasses'.

The Steinglasses' property is in two portions which are separated by a steep bank or drop-off. At the lower level sits the boathouse/residence; at the upper level is a new, two-story, three-car garage.

In 1975 when the Steinglasses moved into the boathouse, they needed to apply to have it renovated for that purpose. Their application was turned down by the CEO but approved by the ZBA.

In 1981 when the property was divided, the Steinglasses again needed approval to have two residences on their original lot. The CEO denied this request but the ZBA reversed his decision.

In 1984, the Steinglasses received approval to increase the size of the boathouse with a one-story addition which added 192 square feet to the size of the house.

In 1986, the Steinglasses received a building permit and built a one-story, three bay garage on the upper level of their lot. In 1999, they applied for a building permit to remove this garage and replace it with a residential structure. Though this was approved by the ZBA, the Lewises appealed this action, a stop work order issued, and the Steinglasses abandoned their plan to build a residence on the upper level of their lot. Instead, they successfully applied for and obtained, over the Lewises' objections, a

permit to build a new two-story garage in place of the older one. It was built in 2000 or thereafter.

The Steinglasses' property also features two outbuildings.

The Steinglasses' current lot is within the special flood hazard area identified by the Federal Emergency Management Agency and is also within the shoreland setback area under Rockport's Land Use Ordinance ("LUO"). The boathouse is nonconforming in that it is not set back 75 feet from the water as would be required for new construction under the LUO. The property is also nonconforming with regard to lot coverage because the LUO only permits 20% lot coverage in this district and the Steinglasses' existing structure exceeds that.

The appraisal of the Steinglass property for town tax purposes in 2003 was $672,700 for the land and $85,500 for the buildings.

In October of 2002,[3] Marsha Steinglass applied for and was given a special exception to the LUO to lift the boathouse, install a new foundation on the lower level of the Steinglass property, place the boathouse on this new foundation, and expand the size of the building by 30%.

In granting this special exception, the ZBA determined, among other findings, that:

- "The renovated structure will be expanded in volume and area by no more than the 30% permitted" under the LUO. R., tab 1, A.

- ". . . the renovated structure and foundation will be no more non-conforming than the existing structure and will be less non-conforming with regard to the 75-foot shoreland setback than the existing building by as many feet as practical." *Id.*

- The foundation "will not cause the structure to be elevated by more than three additional feet." *Id.*

---

[3] The ZBA formally issued the special exception on November 5, 2002, but voted to do so on October 16, 2003.

- "The distance the new foundation can be located back from the high water line on the lower level of the property is limited by the location of the sewer easement granted by the applicant to the Town of Rockport and by the steep slope at the rear of the lower level of her property." *Id.*

- "It is not practical to relocate the existing structure to the upper portion of the applicant's property." *Id.*

- Issues of flood plan analysis and shoreland zoning with regard to lot coverage are the responsibility of the CEO.

- "The renovated structure and new foundation will be located a distance from the high water line that is the greatest extent possible." *Id.*

- "The proposed use will not significantly depreciate the value of surrounding property and may, in fact, appreciate it." *Id.*

- "The proposed use is the same as the existing use and is seeking to cure rapid deterioration of the structure." *Id.*

- "The proposed use will not have an adverse effect on surrounding property since the proposed 30% expansion is permitted" by the LUO. *Id.*

- "The proposed use is the same as the existing use and therefore will not have an adverse effect on the use and quiet possession of surrounding property owners." *Id.*

The Lewises sent an e-mail on the same day as the hearing on the application, objecting to it and asking that the hearing be rescheduled so they could attend and present their objections in person. The ZBA rejected this request, finding that the Lewises had received adequate notice.

On March 4, 2003, the Steinglasses applied to the ZBA for a variance from the FMO provisions which would prohibit improvements to a structure that would cost 50% or more of the value of the property located within the floodplain district. They also asked for a variance to move their house to "a more appropriate location and elevation." R., tab 9, p. 2.

A hearing on the request for a variance was conducted on March 19, 2003, at which the Lewises were represented by counsel. Thereafter, the ZBA issued draft

findings of fact to which the Lewises' counsel objected. On April 22, 2003, the ZBA issued its decision granting the variance and made findings of fact and conclusions of law which included some of those found in their decision of November 5, 2002, but also included, *inter alia*, the following:

- "The Steinglass structure . . . has aged and deteriorated over the last 25 years. The house has no foundation and no central heat, with heat being provided by wood stoves and kerosene space heaters. The sills are rotting and the windows, doors, floors, cabinets need to be replaced." R, tab. 35.

- "The existing structure and the lower level of the property are situated entirely within the 75-foot shoreland setback from the high water line and 100-year flood plain, as is the site of the proposed relocation of the existing structure." *Id.*

- "At its meeting of October 16, 2003, the Board did not review the application with regard to the variance requirements of the Town of Rockport Flood Plain Management Ordinance." *Id.*

- "The applicants stipulated that since the cost of reconstruction will exceed 50% of the market value of the property, the project falls under the Floodplain Management Ordinance Article XIII definition of Substantial Improvement: 'Means any reconstruction, rehabilitation, addition, or other improvement of a structure, the cost of which equals or exceeds 50 percent of the market value of the structure before the start of construction of the improvement. This term includes structures that have incurred substantial damage, regardless of the actual repair work performed . . .'" *Id.*

- "Sue Baker of the State Planning Office's Floodplain Management Program has advised in her memo of March 18, 2003 that the project must be considered new construction, and the Town must require that all new construction be compliant with the elevation requirements found in the Town's floodplain management regulations at Article VI-Development Standards." *Id.*

- "Per Floodplain Management Ordinance Article VI.K-Development Standards/Coastal Plain, new construction or substantial improvement of any structure shall be elevated such that the bottom of the lowest structural member of the lowest floor is elevated to one foot above the base flood level. Accordingly, the applicants' house would have to be moved back and up, with the first floor one foot above the 100-year flood or at 21 feet. The house is presently at 10-1/2 feet."

This is in contrast to Land Use Ordinance Section 1412.3.1.a-Shoreland Zoning Overlay District/Non-Conforming Structures: "Construction or enlargement of a foundation beneath the existing structure shall not be considered an expansion of the structure provided that the structure and new foundation are placed such that the setback requirement is met to the greatest

practical extent as determined by the Zoning Boards of Appeals . . . and that the foundation does not cause the structure to be elevated by more than three (3) additional feet." *Id.*

•    "By virtue of the stipulation by the applicant that this is substantial improvement case, or that by virtue of the memorandum of March 18, 2003 from the State Planning Office to Victor Steinglass determining that the project is new construction, the 21-foot elevation requirement of Article VI.K.2.b(1) of the Town of Rockport Floodplain Management Ordinance must be met." *Id.*

•    "The property is not within a *floodway* as defined in the Floodplain Management Ordinance." *Id.*

•    "The Board finds that failure to grant the variance will result in 'undue hardship,' as follows:

   a.    That the land in question cannot yield a reasonable return unless a variance is granted. This standard was met because, without a variance, the house cannot be moved and will deteriorate to a state of disrepair given the limitation on rehabilitation expenses in the Floodplain Management Ordinance.

   b.    That the need for a variance is due to the unique circumstances of the property and not to the general conditions in the neighborhood, because the steep hill and sewer easement prevent them from moving the house further back and it is not practical to require that the building be moved to the top of the hill. Because of the past nature of the property, a variance from 21 feet to 15 feet is reasonable.

   c.    That the granting of a variance will not detrimentally alter the essential character of the locality, since moving the house back to the extent already approved by the Zoning Board of Appeals will improve the residential character of the locality will (sic) making the least impact on the neighbors.

   d.    That the hardship is not the result of action taken by the applicant or a prior owner." *Id.*

•    "With regard to Article IX.C of the Rockport Floodplain Management Ordinance that the first floor level of 15 feet is the minimum (sic) height practical given the physical character of the land, as previously found at the Zoning Board of Appeals meeting of October 16, 2002." *Id.*

In the end, the ZBA provided the Steinglasses a variance which would excuse them from the 21-foot flood elevation requirement and permit them to move their house

to a 15-foot flood elevation and also allow them to improve this structure by more than 50% of its current market value at its new site.

The Lewises have appealed this decision to this court in the case numbered AP-03-006.

On April 8, 2003, and then again on April 25, 2003, the Steinglasses submitted new plans to the CEO showing enlarged floor plans for the boathouse on its new foundation. The April 25 plan shows new lot coverage of 23.10%, but contained no information regarding the elevation of the first floor above the 100-year flood level.

On May 2, 2003, the CEO issued building permit no. 1429 and flood hazard permit no. 1430 to the Steinglasses which would allow them to begin construction of their home. The Lewises appealed the issuance of these permits to the ZBA.

On July 23, 2003, the ZBA conducted a hearing on the appeal and, in two formal written findings of fact and conclusions of law, dated September 3, 2003, denied the Lewises' appeal as to the issuance of each of the cited permits.

In its decision as to permit no. 1429, the ZBA acknowledged that the Lewises had argued that the Steinglasses had not obtained a variance under section 1415.3.3 of the LUO which requires that "first floor elevation or openings of all buildings and structures . . . shall be elevated at least one foot above the elevation of the 100 year flood . . ." R., tab 150, p. 3, ¶ 20, but found that LUO § 1415.3, subsections 1-4, did "not pertain to the movement of an existing structure." *Id.*, ¶ 1.[4]

The ZBA also noted that maximum lot coverage in the shoreland overlay district is 20% and that the existing lot coverage on the Steinglass lot is 22.8% so that the lot is nonconforming. The ZBA further found, though, that the discrepancy in lot coverage

---

[4] In this decision, the ZBA repeated many of its findings which it had made in its November 5, 2002, and April 22, 2003 decisions.

figures between 22.8% and a plan submitted by the Steinglasses was the result of computer error by an engineering firm with the result that lot coverage would actually remain at 22.8% as it had been.

The ZBA denied this appeal of the Lewises with the result that the Steinglasses were permitted to expand their residence's size in volume or square footage, but not by more than 30%, and that the lot coverage would remain nonconforming and could not exceed 22.8%.

As to permit no. 1430, the flood hazard permit, the board again made findings substantially the same as they had made as to building permit no. 1429. They noted that the appeal for this permit was based on the Lewises' claim that the Steinglasses, after they had received their variance, had made numerous changes in the plans submitted to the CEO. The board found, however, that their earlier variance under the FMO allowing them to build at 15 feet rather than 21 feet above flood level and to improve their house by 50% of its value did not relieve them from the development requirements of the FMO which must be complied with. That being so, the issuance of the flood hazard permit was proper and the Lewises' appeal of that permit would be denied.

The Lewises have appealed the ZBA's decision to deny their appeal of the issuance of permits 1429 and 1430 to this court in the case bearing docket number AP-03-019.

## II.    Standing.

In both cases before the court, AO-03-006 and AP-03-019, the Steinglasses argue that the Lewises have not established standing to object to their variance and permits. As both parties have acknowledged in their briefs, the threshold for establishing standing is not a high one. In order to appeal a decision of a zoning board of appeals

pursuant to 30-A M.R.S.A. § 2691(3)(G), "a party must (1) 'have appeared before the board of appeals; and (2) be able to demonstrate a particularized injury as a result of the board's action.'" *Sproul v. Town of Boothbay Harbor,* 2000 ME 30, ¶ 6, 746 A.2d 368, 371 (internal quotations omitted). "The requirement of 'particularized injury' is met when the judgment [of the ZBA] adversely and directly affects the party's property, pecuniary or personal rights." *Anderson v. Swanson,* 534 A.2d 1286, 1288 (Me. 1987) (quoting *New England Herald Dev. Group v. Falmouth,* 521 A.2d 693, 696 (Me. 1987)). Generally, the Law Court has found standing when the party objecting to an application before a ZBA is an abutter provided that there is an additional allegation of injury. *Anderson v. Swanson, id.*

In the case at bar, there is no question that the Lewises appeared before the ZBA and contested the variance and two permits at issue here. There is also no question that the Lewises' property abuts the Steinglasses' as their properties used to be one lot and they now share a common property line of approximately 250 feet. The Steinglasses allege, however, and the record supports this contention, that the Lewises never established the "potential for particularized injury" which would satisfy the standing requirement for an abutter. *Sproul v. Town of Boothbay Harbor, id.*

The Lewises contest this argument but cite the court to no fact in the record, except their abutter status, which would show that the changes to the Steinglass house would affect them in any way other than the bold statement in their reply brief in AP-03-006 that "the ZBA's grant of the Steinglasses' requested variance adversely impacts the Lewises." Reply Brief of Plaintiffs Barbara A. and Salim B. Lewis, p. 2. Even the references in the Lewises' reply brief to the new shape and position of the Steinglasses' house do not tell how these circumstances affect them other than to tell the court that the properties are adjacent to each other. Moreover, the record references provided by

the Lewises simply tell the court that the Steinglasses' property does not meet the four criteria to establish undue hardship including the criterion that the property's changes would alter the essential character of the neighborhood. *See, e.g., id.* p. 4 (R., tab 27 at 36). In the court's view, the unadorned claim that a property does not satisfy the elements to establish undue hardship does not meet the need to show some particularized injury by the party contesting the variance.

Nor is it enough, in the court's view, for the Lewises to argue that the ZBA was familiar with their property and their past disputes with the Steinglasses so that the board must have understood that they have standing to object to the variance and permit requests then under review. So while the record would show that this board was familiar with these parties and their properties, neither it, nor this court, were told how the Lewises would be in any way affected by the changes in the Steinglasses' property. Because the court may only review the record properly before it, M.R. Civ. P. 80B(f), it is not permitted to speculate as to what the ZBA may have been told in other cases, if anything at all, about potential injury to the Lewises from development activity at the Steinglasses'.

The Lewises cite the court to the case of *Harrington v. City of Biddeford*, 583 A.2d 695, 696 (Me. 1990) to illustrate how little is needed to demonstrate particularized injury and, therefore, standing. In that case, the Harringtons objected to the issuance of a building permit to the Johnsons which would allow the latter to build with a 15-foot setback while the Harringtons had a 50-foot setback in a neighborhood which the latter claimed was subject to a 40-foot setback requirement. The Law Court found that the Harringtons did demonstrate a particularized injury because only one lot separated theirs from the Johnsons so that allowing the Johnsons to build closer to the street than the Harringtons would, apparently, affect them. The Law Court did not advise as to

what that injury might be, but it may be inferred that permitting a party a variance to a setback in a residential neighborhood would have the usual impacts that setbacks are designed to avoid including, for example, the effect on sight distances created when a house is allowed to be built closer to the street than its neighbors'.

In the case at bar, no such injury may be inferred. The Lewises have not said that their view of the ocean or surrounding area would be disturbed, that their property's value might be affected, that they might be inconvenienced by the Steinglasses' changes, or that there may be any other impact to them, adverse or otherwise.[5]

Instead, this case most closely approximates *Harrington v. Inhabitants of the Town of Kennebunk*, 459 A.2d 557, 559-560 (Me. 1983). In that case, the Law Court ruled that it was error for the Superior Court to have found that the Harringtons had standing to object to a building permit to the Dionnes who wished to rebuild a house across the street from the Harringtons on a lot situated between their home and the ocean. The court held that the Harringtons' allegations in their complaint that the approval of the Dionnes' permit would alter the character of the neighborhood and decrease their property value were insufficient to establish standing because, apparently, there was no evidence on those claims and the trial court's determination that, based on judicial notice, the Harringtons' view of the ocean will be disturbed was an erroneous use of that evidentiary rule. The meaning of this case is plain – to establish particularized injury there must be some admissible evidence to show what that injury may be, and a court may not infer injury simply by the fact that the parties' properties abut, by its independent review of maps or the like, or by the bare allegation of an injury.

---

[5] At oral argument the court was referred to a map at tab 50G to show the relationship of the properties at issue. While this map does show the Steinglasses' property and where their house may be moved, it shows nothing as to any impact on the Lewises' land nearby from the Steinglasses' proposed improvements.

Here, too, there was nothing cited in the complaint, no evidence produced before the ZBA, and none cited in the materials properly before this court, that the Lewises will suffer any injury by the Steinglasses' proposed improvements of their property. That being so, the court must conclude that the Lewises lack standing to prosecute this appeal and it must be denied.

## III. The Merits.

Even though the court will be denying the Lewises' appeal because they lack standing to pursue it, it is nevertheless prudent to address the merits of each case in order to accommodate the parties' potential desire for appellate review. That is, if the Lewises appeal and are successful in overturning this court's decision as it relates to standing, it would be more efficient to have the Law Court also review this case on the merits rather than postpone that exercise via a remand to this court.

### A. AO-03-006.

As noted, *infra,* in this case the Lewises appeal the ZBA's grant of a variance to the Steinglasses under the town's FMO so that the latter may relocate their house without placing it above the prescribed floodplain elevation. The variance also permitted the Steinglasses to improve their home by more than 50% of its current value. The previous special exception of October 2002 would permit them to enlarge the house as well. The Lewises' appeal is based on the contention that the Steinglasses failed to establish before the ZBA that they would suffer undue hardship if the variances were not granted.

When considering the merits of a Rule 80B appeal, the court is to examine the record and review the decision of the municipality for "error of law, abuse of discretion, or findings not supported by substantial evidence in the record." *Yates v. Town of Southwest Harbor,* 2001 ME 2, ¶ 10, 763 A.2d 1168, 1171 (citing *Sproul v. Town of Boothbay*

*Harbor*, 2000 ME 30, ¶ 8, 746 A.2d 368, 372). The substantial evidence standard requires the court to examine the entire record "to determine whether on the basis of all the testimony and exhibits before the [board] it could fairly and reasonably find the facts as it did." *Ryan v. Town of Camden*, 582 A.2d 973, 975 (Me. 1990). The court is not permitted to "make findings independent of those explicitly or implicitly found by the board or [to] substitute its judgment for that of the board." *Perrin v. Town of Kittery*, 591 A.2d 861, 863 (Me. 1991). "The board's decision is not wrong because the record is inconsistent or a different conclusion could be drawn from it." *Twigg v. Town of Kennebunk*, 662 A.2d 914, 916 (Me. 1995). In order to prevail in an 80B action, the plaintiff must show "not only that the board's findings are unsupported by record evidence, but also that the record compels contrary findings." *Total Quality v. Town of Scarborough*, 588 A.2d 283, 284 (Me. 1991).

According to the FMO, variances are to be granted only upon "a determination that failure to grant the variance would result in 'undue hardship.'" R., tab 29, p. 15.[6] The elements of "undue hardship" are:

a.      that the land in question cannot yield a reasonable return unless a variance is granted; and,

b.      that the need for a variance is due to the unique circumstances of the property and not to the general conditions in the neighborhood; and,

c.      that the granting of a variance will not alter the essential character of the locality; and,

d.      that the hardship is not the result of action taken by the applicant or a prior owner.

---

[6] Floodplain Management Ordinance for the Town of Rockport, Maine, article IX(B). This provision also has other requirements for a variance which the plaintiffs do not cite in their arguments.

*Id.*

The Lewises maintain that the board erred in finding that each of these four elements had been established by the Steinglasses so that they could have their variance.

With respect to element "a," the Lewises argue that the Steinglasses will obtain a reasonable return for their property without a variance. They point out that the land and boathouse as they are currently situated have a market value of approximately $900,000 made up of land worth $700,000, and a house worth $200,000, and that the Steinglasses currently live there with no plans to move. That being so, the Lewises say, the property could be, and is, being beneficially used by the Steinglasses or could be by a potential buyer. This falls short, therefore, of the need to show "a loss of all beneficial use of the property" – the test for determining that property cannot yield a reasonable return. *White v. Town of Hollis*, 589 A.2d 46, 48 (Me. 1991).

Moreover, the Lewises point to evidence in the record that would permit one to conclude that the Steinglasses' current boathouse was repairable, or that they could build where their garage currently sits, without the property depreciating in value, thereby allowing its beneficial use.

The Steinglasses counter this argument by referring to the ZBA's conclusion on this point that the reasonable return standard was met "because, without a variance, the house cannot be moved and will deteriorate to a state of disrepair given the limitation on rehabilitation expenses in the [FMO]." R., tab 35, p. 3. However, the Steinglasses explain in their brief, the ZBA "chose to apply the undefined words 'reasonable return' in a pragmatic, common sense way . . ." Rule 80B Brief of Parties-in-Interest, p. 18. They make this argument because they say that the FMO should not be treated as a land use or zoning ordinance but instead as a building code so that its terms are susceptible

to common language interpretation rather than the legal definitions which have evolved over time for terms and phrases in zoning cases. That being so, they say, "reasonable return" should be given the meaning which the ZBA must have intended, resulting in the practical solution of letting the Steinglasses move and improve their house up from the shore.

The Lewises correctly point out, however, that the FMO was adopted as a land use ordinance pursuant to the statutory authority to do so. R., tab 29, p. 1. *See* 30-A M.R.S.A. § 4352; 38 M.R.S.A. § 440. In addition, the court concurs with the Lewises' argument that the FMO is not to be viewed as a building code as such is differentiated from a land use ordinance. *See Bragdon v. Town of Vassalboro*, 2001 ME 137, ¶ 8, 780 A.2d 299, 302. Instead, the FMO meets the definition of a zoning ordinance in that it divides the town into several zones based upon a zone's risk for flood and then applies rules for these districts. All this being so, the court must apply the definitions crafted in our law to explain that a property which cannot yield "a reasonable return," as noted, *infra*, is one which has suffered "the practical loss of all beneficial use of the land." *Twigg v. Kennebunk*, 662 A.2d 914, 918 (Me. 1995).

In the court's view, notwithstanding the deferential approach it must take to findings of a ZBA, this board misapplied the "reasonable return" test by implicitly finding that the property had no beneficial use unless they allowed the Steinglasses to move and substantially improve their boathouse. The record shows that the boathouse could be repaired on site, or that a new house could be built on the Steinglasses' land above the floodplain, or that the property could be sold for a considerable sum, so that a new owner could do likewise. Accordingly, this court concludes that the ZBA erred in applying a more lenient, less exacting test in deciding that the Steinglasses could not receive a reasonable return for their property without a variance. *See Rowe v. City of*

*Westbrook*, 1999 ME, 81, ¶¶ 5-11, 730 A.2d 673. Thus, if the Lewises had standing to pursue this case, the appeal would be granted on this basis.

As to element "b" of the undue hardship test, namely that the need for a variance would be, "Due to the unique circumstances of the property and not to the general conditions in the neighborhood," R., tab 29, p. 15, the ZBA found that the Steinglasses met this test because the steep hill on their property and a sewer easement prevent them from moving the house further back (on the lower level of their lot) and that it would not be practical to require that the existing building be moved to the top of the hill. The ZBA therefore found that allowing the house to be relocated at 15 feet above flood level instead of 21 feet would be reasonable.

There can be no question that the ZBA's findings as to this element of the undue hardship test are supported in the record. The Steinglasses' lot has an unusual configuration that would make it very difficult to relocate the boathouse to the upper level of the lot. The lower level has its own challenges. It is impinged by sewer easement, a steep hill to its rear, and tidal water at its front. Accordingly, if it is necessary to move the house, the unique circumstances of the property would only suffer its relocation on the lower lot to its very rear – the site which the Steinglasses have proposed. That being so, the variance, at least as to elevation, would be justified by the unique circumstances of the property.

In addition, while there is little in the record concerning the general conditions of the neighborhood where the Steinglass property may be found, it does appear that their lot is not typical of the neighborhood. Accordingly, it would appear to be correct that granting the variance would not be based on the general condition of the neighborhood.

In their argument, the Lewises rely on the case of *Bernard v. Zoning Board of Appeals of Town of Yarmouth*, 313 A.2d 741, 749 (Me. 1974) for the proposition that

"uniqueness" cannot be found simply by the unusual shape of a lot in relation to others in the area if its owner is not denied the normal use of his land and where the purpose of the applicable ordinance is to prevent what the lot owner proposes.

The "reasonable return" analysis aside, it does appear that the use of the lower level of the Steinglasses' property for residential housing would be barred by the FMO, absent extraordinary steps, such as putting the house on stilts. Moreover, in the absence of the FMO, such a use might be "normal" if the house was to the rear of the lower level and the Steinglasses' proposed removal were to be accomplished at the site they wish. Finally, while it is true that the FMO would seek to bar construction below the 21-foot level, it is also true that, as to elevation, the moved Steinglass house would be less nonconforming than their current boathouse. This being the case, it would not be unreasonable for the ZBA to have concluded, as to the uniqueness test alone, that the Steinglasses would be denied the more normal use of their lot by relocating their house to a more practical spot that would make it less nonconforming.

By this analysis, the court would be required to affirm the ZBA's analysis as to the uniqueness of the Steinglasses' property so that undue hardship might be found on this basis.

Element "c" of the undue hardship test requires a finding that the granting of the variance would "not alter the essential character of the locality." R., tab 29, p. 15. In this instance, the ZBA found that the variance would not detrimentally alter the essential character of the locality because moving the house back on the Steinglasses' lot would, in fact, improve the neighborhood and have "the least impact on the neighbors."

The Lewises cite no facts in the record which might undercut this conclusion. Indeed, as noted, *supra*, the relocation, repairs to, and improvement of the Steinglasses' house would make it less nonconforming than its current situation. That being so, the

ZBA's conclusion that the Steinglasses' relocated house would improve the residential character of the neighborhood is fully supported in the record and cannot be disturbed here.

The final element of the undue hardship test requires that the board find that "the hardship is not the result of action taken by the applicant or a prior owner." R., tab 29, p. 15. The ZBA simply found that the Steinglasses met this test without further elaboration.

The Lewises argue that any hardship suffered by the Steinglasses is of their own making. This is because when they bought their land, it already had a residence there but they chose to divide the land, sell the residential structure, and move into the boathouse on the shore. Accordingly, the Lewises say, any problems with the location and deterioration of the boathouse as a dwelling stem from the Steinglasses' election to use that structure as a home.

A finding of self-created hardship may be based, in part, on whether a purchaser of property, as to which he now seeks a variance, knew of the applicable zoning restrictions before the purchase. *See Twigg v. Town of Kennebunk*, 662 A.2d 914, 917-918 (Me. 1995). The record shows that the FMO was adopted by the Town of Rockport after the Steinglasses bought and then divided their property. Moreover, at the time they divided their property and moved into the boathouse, they complied with local zoning ordinances and, apparently, received the permits and variances to accomplish these moves. In the 20 or so years since they have lived in the boathouse, it has now reached a deteriorated state and is in a flood zone established after their move. Because there is no reason to believe that the Steinglasses caused their house to deteriorate and the restrictions as to its location are more recent than the property's purchase, it would be reasonable to conclude that the hardship the Steinglasses cite for a variance was not the

result of their actions. That being so, the court must concur with the ZBA's decision in this regard.

In conclusion, the court finds that the Lewises lack standing to prosecute this appeal so that it must be denied and the decision of the Zoning Board of Appeals of March 19, 2003, affirmed. If, however, the court has erred with respect to the issue of the Lewises' standing, the court would reverse and vacate the decision of the ZBA because the court believes that entity erred when it concluded that the Steinglasses should be granted a variance on the basis of undue hardship because their land would not yield a reasonable return without the variance.

**B.  AP-03-019.**

Because the court has found that the Lewises lack standing to prosecute AP-03-006 and because the record on this point is the same in both cases, the court will be denying the appeal as to AP-03-019. However, if this conclusion is erroneous, the Lewises would prevail on this appeal because the court has concluded in AP-03-006 that the ZBA erred in granting a variance to the Steinglasses. That being so, it would also be error for the ZBA to have affirmed the CEO's issuance of permits to the Steinglasses to pursue their building plans. Nevertheless, it is worth reviewing the merits of the arguments in this appeal so that the parties will have a complete record should either of them wish to pursue this case in our Law Court.

The Lewises argue that the decision of the ZBA upholding the issuance of permit no. 1429, a building permit, was erroneous because it violates two provisions in Rockport's LUO.

The first provision the Lewises rely on is the requirement in the LUO that the first floor elevation or openings "of all buildings and structures . . . shall be elevated at least one foot above the elevation of the 100 year flood . . ." R., vol. 3, tab 152, p. 14-10,

Town of Rockport Land Use Ordinance, § 1415.3(3). The Lewises correctly point out that the Steinglasses' new location for their house does not meet this standard and that they never received a variance excusing them from its application.

The ZBA concluded, however, that this section of the LUO did not pertain to the moving of an existing structure. R., vol. 3, tab 150, p. 3. The Lewises argue that this was an erroneous conclusion of law and this court concurs with that view.

As the plaintiffs have argued, section 1415.3 is divided into seven subsections each of which applies to a different type of building situation. Subsection 3 specifically applies to *all* principal and accessory structures and requires that first floor elevations and openings, including basements, be above the 100-year flood level. While it is true that this provision would not apply to grandfathered structures or buildings in existence when the LUO was adopted in 1974, it must apply to *all* buildings thereafter that may be affected by this flood level. Because "all" is not further modified, it must be given this literal and plain meaning and applied to every building or structure so affected. This is because the LUO requires that all words not specifically defined by the LUO "shall carry their customary and usual meanings." R., vol. 3, tab 52, p. 3-1; Town of Rockport Land Use Ordinance, § 301. Thus, the Steinglasses' boathouse which was to be expanded by 30%, improved in value by 50%, and moved on to a new foundation would certainly qualify as a building or structure which must accommodate this rule or secure a variance to be excused from it. The fact that a good portion of the house, once moved, will consist of a structure which existed beforehand does not change this result. The Steinglasses are making substantial modifications in the size and location of this structure and need a variation for its elevation just as it had under the FMO.

To the extent that the ZBA concluded that section 1415.3(3) did not apply to existing structures so that only new construction was affected, it is worth making two

observations. First, subsection 3 does not limit itself to new structures; as noted, it covers *all* buildings and structures without regard to age. If the authors of Rockport's LUO had wanted to have subsection 3 apply to new structures only, it could have done so as it did with section 1415.3(1). From its failure to do so, the court must conclude that section 1415.3(3) is not limited to new structures.

Second, if section 1415.3(3) is applicable to new structures only, then the Steinglasses' newly expanded and positioned house would meet that definition as it did when the ZBA was applying the FMO. That ordinance, on which the Steinglasses and the ZBA relied in considering the movement of the house, defines "new construction" as "structures for which the 'start of construction' commenced on or after the effective date of floodplain management regulations adopted by a community and includes any subsequent improvements to such structures." FMO, art. XIII, p. 22. "Start of Construction" as referenced in this definition "means the date the building permit was issued . . ." *Id.* From this it may be learned that any improvements to a structure after a permit has been issued is "new construction" to which the FMO applies.[7]

It would be an incongruous interpretation of these two land use ordinances, which are designed to govern building within the shore area, as having different meanings for the construction and/or improvement of the same building. Under both ordinances, if that were the case, the more restrictive ordinance or standard must apply. LUO § 403; FMO art. XII. That being so, the court may consider the Steinglasses' renovated and relocated house as either a new, or a member of a class of "all," structures, either of which would require the imposition of the restrictive standards of both ordinances, including section 1415.3(3) of the LUO.

---

[7] This interpretation of the FMO is consistent with the one offered by the State Planning Office to the CEO through Victor Steinglass and was adopted by the ZBA in granting this building permit. R., vol. 2, tab 108; vol. 3, tab 150, p. 2.

The Lewises are also correct that, contrary to the Steinglasses' argument, that zoning ordinances are to be strictly construed. *Lewis v. Maine Coast Artists*, 2001 ME 75, ¶ 26, 770 A.2d 644, 653. This is so that the policy of zoning to gradually eliminate nonconforming structures may be effective. *Id.*

Finally, simply because the ZBA granted a variance under the FMO does not mean that the board was not required to act under the LUO. The two land use ordinances may have overlapping provisions which affect structures in the flood zone, but a variance as to one does not equal a variance as to the other. Thus, though the Steinglasses obtained a variance to move their house within the floodplain, they still needed permission, for example, to have doors below the 100-year flood level.

From all this, the court finds that the ZBA erred in issuing permit no. 1429 without requiring the Steinglasses to apply for, and obtain, a variance from LUO § 1415.3(3). The court does so because it concludes that the ZBA's interpretation of the cited section was erroneous as a matter of law.

The Lewises also complain that the ZBA erred by not requiring the Steinglasses to apply for a variance as to lot coverage when they submitted their plan for their renovated, moved house. They correctly point to the provision in the LUO which limits lot coverage by imperious material to 20% in the Shoreland Overlay District where the Steinglasses' property is found. R., vol. III, tab 152, p. 9-2; LUO § 901.4. They further say that in 2000 when Marsha Steinglass applied to build a new residence on the upper level of their property, evidence was presented to the ZBA that their lot coverage was 21.77% at that time which exceeded the maximum permitted under the LUO. As such, the lot was then nonconforming.

However, when the Steinglasses next submitted plans to the ZBA to obtain the special exception to the LUO, they submitted a plan which showed their renovated

home on its new site with 22.8% lot coverage. Then, the Lewises say, the Steinglasses developed a plan for their reconstructed dwelling which showed existing lot coverage of 23.1%. This plan was received by the town on April 25, 2003.

These representations are properly supported in the record, but the Steinglasses explain the difference between the 22.8% and 23.1% figures as errors made by their engineer, a fact which is also supported in the record, with the result that the proper lot coverage number is the lower one, namely 22.8%.

The Lewises agree that the more accurate survey does show lot coverage of 22.8% but argue that the Steinglasses nevertheless needed a variance to increase their nonconforming lot coverage from 21.77% to 22.8%.

The Steinglasses' explanation for this difference in figures is that the 21.77% number was merely an estimate while the 22.8% figure is supported by an engineer's survey. They support this by reference to the surveyor's 1999 report which contains modifiers that could reasonably support the opinion that the surveyor was not providing exact figures. While this is subject to debate, it is also true that the ZBA had no information that between 1999 and 2002 the Steinglasses had taken any steps to expand their lot coverage. The board also was given a precise engineering report which contained no language suggesting estimation. That being so, the board could reasonably find that the proper coverage figure before the permits would be granted was 22.8%. Because that finding has adequate support in the record, it my not be disturbed by this court, even though another finding would be possible. *Twigg v. Town of Kennebunk*, 662 A.2d 914, 916 (Me. 1995). Accordingly, it must be concluded that the Steinglasses were not required to apply for a variance to increase their lot coverage from the existing, nonconforming 22.8%.

As to flood hazard permit no. 1430, the Lewises' sole argument is that because it was based on an illegal variance under the FMO, it must be set aside because the ZBA erroneously found that the Steinglasses met the undue hardship standard in obtaining a variance under this code. As discussed, *infra*, as to AP-03-006, the court has found that that variance was unlawfully granted because the ZBA applied a relaxed standard for the "reasonable return" test in finding that the Steinglasses would suffer undue hardship if the variance were not granted. That being the case, the court must also find that flood hazard permit no. 1430, which was issued because of that variance, would need to be set aside if the Lewises had standing to prosecute this appeal.

In the end, the court concludes, as it did in AP-03-006, that the Lewises lack standing to pursue this appeal so that it must be denied and the decision of the ZBA confirming the issuance of permits no. 1429 and 1430 must be affirmed. If, however, the court has erred as to its determination of the standing issue, the court would reverse the issuance of the two permits at issue because permit no. 1429 relied on a legally erroneous interpretation of section 1415.3(3) of the LUO and because permit no. 1430 was based on a variance issued on a legally erroneous interpretation of the undue hardship standard to obtain a variance from the FMO.

## IV. Conclusions.

For the reasons stated herein:

The M.R. Civ. P. 80B appeals in cases bearing docket numbers AP-03-006 and AP-03-019 are DENIED and the decisions of the Rockport Zoning Board of Appeals referenced therein are AFFIRMED.

So ordered.

Dated: July 19, 2004

John R. Atwood
Justice, Superior Court

Date Filed __9/4/03__  __Knox__  Docket No. __AP-03-019__

County

Action __80B Appeal__

INHABITANT OF THE TOWN OF ROCKPORT
THOMAS FORD (Code Enforcement Officer)
and PARTIES-in-INTEREST
BARBARA A. LEWIS and SALIM B. LEWIS  vs. MARSHA L. STEINGLASS & VICTOR J.STEINGLA

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| Joanna R. Brown, Esq. | William L. Plouffe, Esq. (Town of Rockpo |
| Pierce Atwood | PO Box 9781               (Thomas Ford) |
| One Monument Square | Portland ME  04104       772-1941 |
| Portland ME  04101 | Christopher L. Vaniotis, Esq.(Steinglass |
| 791-1112 | PO Box 9729 |
| | Portland ME  04104 |
| | 774-1200 |

| Date of Entry | |
|---|---|
| 9/9/03 | On 9/4/03, Complaint for 80B Appeal and Summary Sheet filed. $120.00 fili fee paid. |
| 9/9/03 | Notice and Briefing Scheduled mailed to Attorneys Brown, Vanoitis and Plouffe. |
| 9/25/03 | On 9/17/03, William L. Plouffe, Esq. enters his appearance on behalf of the Town of Rockport and Thomas Ford. |
| 9/22/03 | Christopher Vaniotis, Esq. enters his appearance for Party in Interest Marsha L. Steinglass and Victor J. Steinglass. |
| 9/24/03 | Acknowledgement of Service filed: <br>-William F. Plouffe, Esq. accepts service on behalf of Town of Rockport on 9/15/03. <br>-Christopher L. Vaniotis, Esq. accepts service on behalf of the Steingla on 9/19/03. |
| 11/10/03 | On 10/14/03, Initial Rule 80B Brief of Plaintiffs Barbara A. Lewis and Salim B. Lewis filed by Attorney Brown. |
| 11/26/03 | On 11/13/03, Rule 80B Brief of Parties-In-Interest Marsha and Victor |

Date Filed 5/2/03  Knox  Docket No. AP-03-006
County

Action 80B Appeal

INHAB. OF THE TOWN OF ROCKPORT,

(parties in interest)

MARSHA L. STEINGLASS

BARBARA A. LEWIS AND SALIM B. LEWIS  vs.  and VICTOR J. STEINGLASS

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| Helen L. Edmonds, Esq. One Monument Square Portland ME 04101 791-1100 | William L. Plouffe, Esq. (Town of Rockpo PO Box 9781 Portland ME 04104 772-1941 |
| | Mary Platt Cooper, Esq. (Marsha/Victor PO Box 190 Steinglass) Camden ME 04843 **(W/D 6/10/03)** 236-8836 |
| | Christopher L Vaniotis, Esq. (Steinglass) PO Box 9729 Portland ME 04104 774-1200 |

| Date of Entry | |
|---|---|
| 5/5/03 | On 5/2/03, 80B complaint; $100 filing fee; and Summary Sheet filed by Attorney Edmonds. |
| 5/5/03 | Notice and Briefing Schedule mailed to Attorneys Edmonds and Plouffe and Marsha and Victor Steinglass. |
| 5/7/03 | William L. Plouffe, Esq. enters his appearance on behalf of the Town of Rockport. |
| 5/9/03 | Acknowlegement of Service of Process filed: —William Plouffe, Esq. accepts service on behalf of Town of Rockport on May 6, 2003. |
| 5/13/03 | Mary Platt Cooper, Esq. enters her appearance on behalf of the Defts Marsha Steinglass and Victor Steinglass. |
| 5/21/03 | Acknowlgement of Service of Process filed: —Mary Platt Cooper, Esq. accepts service on behalf of Marsha and Victor Steinglass on 5/21/03. |