2001 ME 75

Patricia LEWIS et al.[1]

v.

MAINE COAST ARTISTS.[2]

Supreme Judicial Court of Maine.

Argued Oct. 5, 2000.
Decided May 4, 2001.

---

1. Charles P. and Dorothy Neidig, parents of Lewis, are additional appellants. They rent land owned by Lewis.

2. The Town of Rockport, a defendant in a previous appeal in the case between these same parties, *see Lewis v. Town of Rockport*, 1998 ME 144, 712 A.2d 1047 (*Lewis I*), and in this action when it was before the Superior Court, did not join in this appeal from the decision of the Superior Court.

John C. Bannon (orally), Murray Plumb & Murray, Portland, for plaintiffs.

Clifford H. Goodall (Orally), Dyer Goodall and Federle LLC, Augusta, for defendant, Maine Coast Artists.

Paul L. Gibbons, Gibbons & Calderwood, L.L.P., Camden, for defendant, Town of Rockport.

Panel: WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

CLIFFORD, J.

[¶ 1] Maine Coast Artists (MCA) appeals from a judgment entered in the Superior Court (Knox County, *Atwood, J.*) vacating a decision of the Rockport Zoning Board of Appeals. The Superior Court ruled in favor of Patricia Lewis in her action challenging MCA's construction renovations of its art gallery located in Rockport. The Superior Court concluded that the doctrine of res judicata precluded MCA from relying on a previously issued building permit. The court also concluded that MCA had abandoned and waived its rights under that permit. We agree with MCA that the Superior Court erred. Therefore, we vacate the judgment, but because the Town must redo the measurements to establish the extent of nonconformity with what is allowed by the first permit, we remand to the Superior Court for remand to the Board for further proceedings.

[¶ 2] MCA owns and operates a nonprofit art gallery. The Zoning Board granted a special exception permit and the Code Enforcement Officer (CEO) issued a building permit (the first permit) on June 8, 1996, to allow MCA to expand and modify its existing building. There was no appeal from the decision to issue that first permit. The Town amended its Land Use Ordinance with new site plan review requirements on June 12, 1996. Three months later, MCA applied for a new special exception permit to allow it to incorporate revised plans for the modification of its building that included an additional one hundred square feet of space. MCA then commenced foundation and structural changes and began demolition pursuant to the first permit.

[¶ 3] The Board found that MCA's building was a nonconforming structure and that the modifications to the building that would be made pursuant to the new permit would violate the height and setback requirements of the Town's Land Use Ordinance. Although the new construction, or parts of it, would violate the new Land Use Ordinance, the Board approved the special exception because the Board concluded that the building would be no more nonconforming than the then-existing structure. The Board granted, and the CEO then issued, a new building permit (the second permit) to MCA on December 2, 1996.

[¶ 4] Pursuant to M.R. Civ. P. 80B, Lewis, the owner of property abutting the MCA property, filed a complaint in the Superior Court seeking judicial review of

the Board's actions regarding the issuance of the second permit. The Superior Court affirmed the decision of the Board. Lewis then appealed to this Court, and we held that the second permit was invalid because it violated the Town's zoning ordinance by increasing the building's nonconformity. We concluded that *any* modification or addition to MCA's building that would result in an increase of nonconforming space was prohibited by the ordinance. *Lewis v. Town of Rockport,* 1998 ME 144, ¶ 13, 712 A.2d 1047, 1050 (*Lewis I*). We remanded to the Superior Court for the entry of a judgment in favor of Lewis on her appeal from the Board's grant of the new special exception and the CEO's issuance of the second building permit. *Id.* ¶ 15, 712 A.2d at 1050. We noted that the validity of the first permit was not before the Court because Lewis did not appeal the grant of the first permit by the Board. *Id.* ¶ 7 n. 2, 712 A.2d at 1049 n. 2.

[¶ 5] After remand, aware that the second permit was invalid, the CEO measured MCA's property to determine its conformity to the building that MCA was authorized to build pursuant to the *first* plan and permit. Lewis protested the CEO's actions and contested the method by which the CEO completed the measurements. She appealed to the Board, claiming that the notice of violations issued to MCA by the CEO omitted many of the significant nonconformities with the ordinance. The CEO found a small sideyard encroachment of a few inches with the roof overhang and jail portion of the building, plus a need for an additional parking space. The property line used by the CEO for purposes of measuring was the *original* boundary line

that existed between the MCA and Lewis properties *prior* to the issuance of the declaratory judgment in another action, brought by Lewis against MCA involving the boundary between the properties owned by those parties. In that action, the Superior Court (*Kravchuk, C.J.*) declared the location of the boundary line between the properties to be closer to MCA's building than the line from which the CEO took the measurements.[3]

[¶ 6] The Board affirmed the CEO's decision, and Lewis again filed an appeal pursuant to M.R. Civ. P. 80B against MCA and the Town. The Superior Court (Knox County, *Atwood, J.*) concluded that, following our decision in *Lewis I,* MCA did not have a valid building permit to authorize any expansion because, based on res judicata, MCA was precluded from relying on the first permit as a justification for the modification to its building, and because MCA waived and abandoned its rights under the first permit.[4] MCA filed this appeal following the decision of the Superior Court.

## I.

[¶ 7] The Superior Court acted in its appellate capacity to determine that the Board abused its discretion or committed an error of law when the Board concluded that MCA was entitled to rely on MCA's first permit in defending its building expansion. We review the decision of the Board directly. *See Kosalka v. Town of Georgetown,* 2000 ME 106, ¶ 10, 752 A.2d 183, 186; *DeSomma v. Town of Casco,* 2000 ME 113, ¶ 7, 755 A.2d 485, 487.

---

3. The court declared Lewis the owner of part of what had been MCA's property after Lewis successfully proved that she acquired title by adverse possession.

4. The Superior Court did not address the extent of the violations that exist because it found that MCA was completely barred from relying on the first permit as authority to make the construction changes.

## A. Res Judicata

[¶ 8] MCA contends that in determining the extent of any violation by MCA of the Town's zoning ordinances, the CEO correctly measured based on the expansion that was authorized by the first permit. MCA contends that it is not precluded by res judicata from relying on the first permit.

[¶ 9] Claim preclusion prevents relitigation of a claim if: (1) the same parties or their privies are involved in both actions; (2) there is a valid final judgment entered in the prior action; and (3) the matters presented for decision in the second action were, or might have been, litigated in the first. *Machias Sav. Bank v. Ramsdell*, 1997 ME 20, ¶ 11, 689 A.2d 595, 599. What was or could have been considered in the first action cannot be the basis of a subsequent action. *Beegan v. Schmidt*, 451 A.2d 642, 644 (Me.1982). The doctrine of res judicata is grounded on concerns for "judicial economy and efficiency, the stability of final judgments, and fairness to litigants." *Id.* at 646. Use of the transactional test to determine whether the matters presented for decision were or might have been litigated in a prior action best serves those concerns. *See Brown v. Osier*, 628 A.2d 125, 127 (Me. 1993).

[¶ 10] In applying the transaction test, the claims are the same if they are part of the same transaction, i.e., they are "founded upon the same transaction, [arise] out of the same nucleus of operative facts, and [seek] redress for essentially the same basic wrong." *Id.* at 127. To determine whether facts arise out of the same transaction, we consider whether the facts are related in time, space, origin, or motivation. *Draus v. Town of Houlton*, 1999 ME 51, ¶ 8, 726 A.2d 1257, 1260 (quoting *Beegan*, 451 A.2d at 645).

[¶ 11] Here, the first and second permits were issued at different times and are not identical. The first permit, which was not challenged, is independent of the second permit. The later permit allowed a greater expansion of the building than the first. In *Lewis I*, Lewis challenged the validity of the second permit and the Board's interpretation of the ordinance, but the first permit was not addressed. *Lewis I*, 1998 ME 144, ¶ 7, 712 A.2d at 1049.

[¶ 12] The central issue before the Board, and now us, involves the extent that the first permit authorizes the construction undertaken by MCA.[5] MCA's contention that the expansion of its building is authorized by the first permit does not grow "out of the same aggregate of operative facts." *See Conn. Nat'l Bank v. Kendall*, 617 A.2d 544, 547 (Me.1992). The issue before us in *Lewis I* was "whether the zoning board erred by interpreting [the land use ordinance] . . . ." and in issuing the later permit. *Lewis I*, 1998 ME 144, ¶ 11, 712 A.2d at 1049. We concluded that MCA's authority to build pursuant to the second plan and permit was void because it resulted in an impermissibly nonconforming building, and that "the zoning board misinterpreted the land use ordinance to allow, by special exception, any modification of or addition to the existing MCA building that would result in an increase in the square footage of nonconforming space." *Id.* ¶ 13, 712 A.2d at 1050.

5. MCA raised in its brief to this Court in *Lewis I* that the first permit was still valid because Lewis did not properly challenge it, and she could therefore not appeal the approval of the site plan review based on the validity of the issuance of the first permit. We specifically did not address the validity of the first permit in *Lewis I*. *Lewis I*, 1998 ME 144, ¶ 7 n. 2, 712 A.2d at 1049 n. 2.

[¶ 13] The first permit was not the authority for the plans and designs being challenged in *Lewis I*, and, therefore, the authority granted by the first permit is not a defense that was required to be raised in *Lewis I*. Accordingly, res judicata does not bar MCA from relying on the initial permit in this action.

### B. Abandonment

[¶ 14] Although the Board found otherwise, the Superior Court concluded that MCA had abandoned or waived its rights under the first permit. We review the action taken by the Board for clear error, and we are limited to determining whether the record contains evidence to justify the Board's determination. *Driscoll v. Gheewalla*, 441 A.2d 1023, 1026 (Me. 1982); *see also Standish Tel. Co. v. Saco River Telegraph & Tel. Co.*, 555 A.2d 478, 480 (Me.1989). The Board expressly found that the earlier permit remained in effect after *Lewis I* because it had never been appealed, abandoned or withdrawn. The Board also concluded that MCA applied for a site review of both plans to preserve the earlier exception and permit.

[¶ 15] Abandonment is a voluntary, affirmative act indicating a clear intent to repudiate ownership. *Duryea v. Elkhorn Coal & Coke Corp.*, 123 Me. 482, 486, 124 A. 206, 208 (1924). To prove abandonment, one must demonstrate "some clear and unmistakable act" to indicate an intent or purpose to relinquish a right. *Pleasant View Mobile Home Park, Inc. v. Town of Mechanic Falls*, 538 A.2d 273, 274–75 (Me.1988). "Non-use, even for lengthy periods of time, is, of itself, insufficient to show an abandonment of a right" especially where the acts manifest an "in-

tent contrary to abandonment." *Id.* at 275. Lewis bears the burden to prove MCA's intent to abandon and MCA's actual abandonment. *See id.*

[¶ 16] Although permits should generally be acted upon diligently to avoid the risk that they lose their validity, Lewis never appealed the first permit. *See George D. Ballard, Builder, Inc. v. City of Westbrook*, 502 A.2d 476, 480 (Me.1985). MCA hired a contractor to begin construction pursuant to the first special exception and first permit, and demolition began in reliance on the first permit before MCA requested a second special exception. MCA spent almost $50,000 pursuant to the first permit. The Board's finding that the first permit was not abandoned is not clear error.

[¶ 17] The Board also considered MCA's later request as a new application for a special exception even though the application itself says it is an amendment. *Lewis I*, 1998 ME 144, ¶ 3, 712 A.2d at 1048. In its brief to the Superior Court in *Lewis I*, the Town acknowledged that the Board reviewed the second application as "a completely new one" and not "merely a review of the amendments to the original plan." The ordinance does not require that the second permit must replace the first. It is possible, under these circumstances, to hold two permits for the same project, when one is more inclusive than the other. Here, the second permit allowed MCA to expand its building further than did the first permit.[6] The Board found that MCA intended to preserve its rights under the first permit when it submitted the first permit for site plan review, and used the first permit to begin construction and demolition. MCA's expansion beyond the

---

**6.** The second permit allowed an increase in the size of the permitted addition for the elevator and stairwell, and for the gift shop area. It also increased the floor area with renovations by 100 square feet and allowed for the completion of the basement area for utility and studio space.

scope of the first permit results in the illegality of that expansion, but it does not follow that the first permit itself is invalid.

## C. Expiration

[¶ 18] Lewis contends that the first permit expired once MCA began its construction after receipt of the second permit.[7] We disagree. MCA began demolition and foundation fill under the authority of the first permit in November of 1996, less than six months after the permit was issued. Although MCA admitted that after December 2, 1996, all construction was completed pursuant to the later permit, the initial demolition relied on the authorization granted in the first permit. All construction thereafter was carried out with both the original and the second building permits present at the site. Contrary to Lewis's contention, MCA did use its permit within one year of the date of the permit, as required by the Shoreland Zoning Ordinance.

[¶ 19] The Board also concluded that the Building Code enacted on June 12, 1996, was not retroactive, and that section 108.2 of the Code does not apply to the first permit because the first permit was granted before the new ordinance was in effect.[8] Consequently, pursuant to the older ordinance, the first permit would not expire simply because MCA did not rely *exclusively* on the first permit for over six months. In accordance with section 108.3 of the newer Code, MCA requested a new site plan review in November of 1996 because it did not begin construction within ninety days of receiving the first permit and it made some changes to its plans. Even if the first permit was subjected to the new ordinance, it does not automatically follow that the first permit becomes invalid for failure to begin construction within ninety days pursuant to section 108.3 of the Building Code. That section may limit the authority of MCA to make other changes, but MCA still has the authority to build what was already approved.

[¶ 20] The possession of two permits, both authorizing changes to a building, does not by that fact itself invalidate the permit authorizing the narrower changes. MCA's first permit did not expire even

---

7. The Land Use Ordinance adopted in 1974 and in effect when the first permit was issued provided: "The permit must be exercised within 6 months and the permit expires 24 months after issuance. Permit may be renewed subject to the provisions of this Ordinance for an additional 24 months."

The 1992 Shoreland Zoning Ordinance in effect when MCA received the first permit required that any person who will "expand, change, or replace an existing use or structure" shall first obtain a permit. In addition, "if no substantial start is made in construction or in the use of the property within one year of the date of the permit, the permit shall lapse and become void." The new Shoreland Zoning Ordinance put into effect in 1997 also requires a permit for changes and provides that a permit will lapse and become void "if no substantial start is made in construction or in the use of the property within one year of the date of the permit."

8. The current Rockport Building Code in effect when the second permit was issued reads:

§ 108.2:
Any permit issued shall become invalid if the authorized work is not commenced within six months after issuance of the permit, or if the authorized work is suspended or abandoned for a period of six months after the time of commencing work.
§ 108.3:
This code shall not require changes in the *construction documents*, construction or designated use group of a building for which a lawful permit has been heretofore issued ... and the construction of which has been actively prosecuted within 90 days after the effective date of this code is completed with dispatch.

though MCA made changes to its building relying on the second permit. Both permits were available at MCA's construction site. MCA began construction pursuant to the first permit, and the Board's decision that the first permit remains valid is not error.

## II.

[¶ 21] Lewis also contends that the actual measurements taken by the CEO were invalid.[9] MCA's building is a nonconforming structure. It was acquired prior to the effective date of the Town's Land Use Ordinance and the grandfather clause authorizes the structure as it existed at that time. *See Turbat Creek Pres., LLC v. Town of Kennebunkport,* 2000 ME 109, ¶ 13, 753 A.2d 489, 492. Unauthorized expansions of nonconforming structures are prohibited, and we concluded in *Lewis I* that the modifications made by MCA pursuant to the second permit were invalid. We stated that any "modifications of or additions to a building that would increase the square footage of nonconforming space within the building, even if it would not increase the linear extent of nonconformance, does make the building more nonconforming." *Lewis I,* 1998 ME 144, ¶ 13, 712 A.2d at 1050.

[¶ 22] The first permit, however, was not challenged and its issuance not appealed. Accordingly, modifications to the building made pursuant to the first permit that may increase the nonconformity cannot be contested. It is important on remand, therefore, that the Board carefully and correctly determine the extent to which the modifications to the building made by MCA conform to or exceed the changes authorized by the first permit.

### A. Land Measurement

[¶ 23] In the action for adverse possession brought by Lewis against MCA, the Superior Court declared the common boundary between MCA and Lewis to be closer to MCA's building than MCA previously believed. The court's decision was based on Lewis's adverse possession of what was a portion of MCA's land for a period of twenty years or more. In measuring the extent of MCA's nonconformity to the setback requirements, the CEO measured the setback from the boundary as it existed *prior* to Lewis's acquisition of title by adverse possession. That measurement was improper.

[¶ 24] Title vests in the adverse possessor by operation of law at the end of the adverse possession period. *Colquhoun v. Webber,* 684 A.2d 405, 410 (Me.1996). Even though the final judgment determining the location of the new boundary is issued by the court at a later time, as it was in early 1998, the twenty-year period entitling Lewis to the property was reached in 1992. *See id.* Accordingly, Lewis was the true owner of the land up to the newly declared boundary at the time the first permit was issued, and any measurements to determine setbacks, pursuant to the zoning ordinance, must be made from that newly declared boundary.[10]

### B. Building Expansion

[¶ 25] Lewis challenges the accuracy of the CEO's measurements of the violations

---

9. The Superior Court concluded that the first permit was invalid, and it never reached the issue of whether the measurements were properly made by the CEO.

10. It is possible that measurements to determine setbacks made from the boundary, as determined by the court in the adverse pos-

session action, may result in nonconformities with the zoning laws beyond those authorized by the first permit. The court, in considering remedies and sanctions, should take into consideration that the unchallenged first permit was issued *prior* to the declaratory judgment that declared the newly established boundary.

of the newly reconstructed building. Lewis acknowledges that portions of the MCA building that encroach upon the minimum six-foot setback existed in the pre-construction building and are exempt under the grandfather clause.[11] She contends, however, that portions of the newly reconstructed building extend into the setback area *beyond* existing exempted encroachments, and beyond encroachments authorized by the first permit.

[¶ 26] The underlying policy of zoning is to gradually eliminate nonconforming structures and uses. *Shackford & Gooch, Inc. v. Town of Kennebunk,* 486 A.2d 102, 105 (Me.1984). Any significant alteration of a nonconforming structure is an extension or expansion. *Id.* "[T]he accepted legal standard has been to strictly construe zoning provisions relating to the extension, expansion or enlargement of nonconforming buildings ...." *Keith v. Saco River Corridor Comm'n,* 464 A.2d 150, 155 (Me.1983). "When an ordinance prohibits enlargement of a nonconforming building, a landowner cannot as a matter of right alter the structure, even if the alteration does not increase the nonconformity." *Shackford & Gooch,* 486 A.2d at 105.

[¶ 27] In *Lewis I,* we concluded that the modification of or addition to MCA's existing building that resulted in an increase in square footage of a nonconforming space is in violation of Rockport's ordinance that provides that a building may not be ex-

panded to become more nonconforming. *Lewis I,* 1998 ME 144, ¶¶ 12, 13, 712 A.2d at 1049–50. The Land Use Ordinance in effect when the first permit was granted does not differ greatly from the current Land Use Ordinance that was at issue in *Lewis I.*[12] The first permit, however, did authorize some nonconformities, and was not appealed. Measurements must be carefully taken to determine the extent to which MCA's building exceeds what was permitted pursuant to the first permit.[13] Such careful measurements must be applied to determine whether MCA's building conforms to authorized height limits as well.

The entry is:

Judgment vacated. Remanded to the Superior Court for remand to the Rockport Zoning Board of Appeals for further proceedings consistent with this opinion.

---

11. Section 505 of the 1997 Land Use Ordinance provides:
Upon approval of the Zoning Board of Appeals, a nonconforming aspect of a lot, structure or use may be changed such that it is less nonconforming or no more nonconforming than the existing situation.

12. Section III(E) of the 1994 Land Use Ordinance of Rockport, pertinent to the first permit, reads: "a nonconforming aspect of a lot, structure or use may be changed such that it

is less nonconforming or no more nonconforming than the existing situation."

13. Lewis also claims a discrepancy in the distance between the rebar and the MCA building roof overhang as illustrated by the sketches prepared by her own surveyor and by the Town's surveyor. The CEO should measure the violations from a precise and accurate sketch plan.