STATE OF MAINE
LINCOLN, ss.

SUPERIOR COURT
LOCATION: WISCASSET
DOCKET NO. LINSC-AP-2018-05

EUGENE & JUDITH MOLINELLI )
)
Plaintiffs, )
)
v. )
)
TOWN OF BOOTHBAY )
)
Defendant. )

ORDER ON PLAINTIFFS'
RULE 80B APPEAL

This matter is before the Court on Plaintiffs' Rule 80B Appeal. Plaintiffs contend that the Town of Boothbay Board of Appeals erred by upholding Notice of Violations issued against them.

## BACKGROUND

Eugene and Judith Molinelli ("the Molinellis") purchased 66 Sawyers Island Road from the Lewis family in 2007. Pl.'s Br. 1. Their deed includes, and they assert, a view easement of the Sheepscot River that is across the road from their property and over a portion of property across the street, 65 Sawyers Island Road, that used to be owned by the Lewis's.[1] Pl.'s Br. 1-2. Peter and Kathryn Wagner (the "Wagners") purchased 65 Sawyers Island Road from the Lewis's in 2012. Def.'s Br. 1. Before the Wagners bought the property, the Lewis's had maintained the vegetation more or less in accordance with the easement. R. 130. After the Wagners purchased the property a dispute arose about the scope of the view easement. R. 130. 65 Sawyers Island Road is located within the

---

[1] The deed restriction states:
> It is agreed that no house or other structure will be built and no vegetation allowed to grow so as to interfere or block the view of the Sheepscot River [from the 66 Sawyers Island Road parcel]."

R. 51.

1

Special Residential zoning district, and a portion of it is also located within the Shoreland Overlay zoning district. R. 27. This means that the Shoreland Zoning Ordinance (ZO), section 3.11.3 pertaining to the clearing or removal of vegetation, applies to the Wagners' property. The ZO provides an exemption from the vegetation clearing and removal technicalities for property within the Shoreland Overlay zoning district that has been consistently maintained. If the property has not been maintained, it is considered to have reverted back to its natural state and is subject to the Shoreland ZO provisions.

The area that the Molinellis assert a view easement over are described as the mowed meadow,[2] the steep slope shoreline, and the understory. R. 133-43. In 2013, the Wagners hired a landscape architect, Sarah Witte, to develop a maintenance plan that would be consistent with both the Shoreland ZO and the Molinellis' view easement. R. 262. Peter Wagner testified before the BOA that Sarah Witte told him that the meadow had not reverted, but that the understory and the steep slope shoreline may have reverted. R. 263.

The Town of Boothbay's ("the Town") Code Enforcement Officer ("CEO") became involved in January 2014 when the Wagners and the Molinellis could not agree on the maintenance to be performed on the Wagners' property. R. 123. After a site visit at the property with former-CEO Dan Breyer, the Molinellis hired their own forester to create a Vegetation Maintenance Plan ("VMP"). R. 213. In July 2015, the Wagners completed maintenance of the view easement per Sarah Witte's report and notified then-CEO Art Dunlap that it was complete. R. 262. In September 2015, the Molinellis conducted additional cutting on the property, prompting a letter from CEO Dunlap to the Molinellis

---

[2] The parties agree that the meadow area has been mowed annually and is not an issue for this appeal. Def.'s Br. 3.

2

directing them to stop any cutting of steep slope and understory until certain zoning requirements were met. R. 262, 110-11. CEO Dunlap further indicated that future cutting would have to be according to a plan filed with, and approved by, his office before cutting occurred. R. 111.

This correspondence caused two additional VMPs to be created by the Molinellis' forester, which were reviewed by an employee of the Department of Environmental Protection, and sent to CEO Dunlap. R. 214. This process lasted from September 2015 through September 2017. R. 110, 148. The Molinellis' lawyer, Attorney Pottle, represents that CEO Dunlap told him that the third VMP was acceptable. R. 214-15. The Town contends that the plan may have been submitted to the CEO in September 2017, but no CEO had ever approved any version of the Molinellis' VMPs. R. 238. In November 2017, the Molinellis hired a licensed arborist to perform maintenance of the steep slope and understory. R. 217. The Molinellis did not seek a permit from the Town for this activity. R. 234.

The Town's new CEO, Jason Lorrain, was informed of this maintenance after it occurred and visited the site on November 13, 2017. R. 27. CEO Lorrain issued 11 Notice of Violations (NOVs) to both the Molinellis and the Wagners on December 21, 2017. R. 27-31. The Molinellis appealed the NOVs to the Boothbay Board of Appeals (BOA) on January 18, 2018. R. 20-22. The appeal hearing was postponed to allow for settlement discussions but no settlement happened. R. 234-35. The Molinellis hired another licensed forester, Steve Pelletier, who went to the site in February 2018 with CEO Lorrain and Sarah Witte to review the cutting. R. 220.

On May 21, 2018, the BOA held a hearing on the Molinellis' appeal of the NOVs. R. 204-306. Attorney Pottle, forester Steve Pelletier, CEO Lorrain, Peter Wagner, and the Town's attorney, Sally Daggett, all testified. The BOA heard evidence about what

3

Pelletier and Lorrain observed on the property, whether the property had reverted, when cutting occurred, and whether any "trees" as defined by the ZO were cut. Ultimately, the BOA upheld eight of the eleven NOVs (1, 4, 5, 6, 7, 8, 10, and 11). R. 305. The BOA issued a three-and-a-half-page written decision with Findings of Fact on May 29, 2018. R. 314-17. It specifically made findings that at least one tree had been cut, vegetation was cut below three feet, and that the steep slope and the understory had reverted. R. 314-17. This Rule 80B appeal timely followed. The Molinellis do not appeal the BOA upholding NOV #7. The NOVs being appealed are the following:

#1. Violation of Section 3.11.3.2.1 of the ZO: A licensed forester was not used to determine what vegetation could be removed.

#4. Violation of Section 3.11.3.2.1.2.1 of the ZO: Cutting did not follow the required point system for trees to remain within seventy-five feet (75') of the high water line of the Sheepscot River.

#5. Violation of Section 3.11.3.2.1.2.2 of the ZO: "Other natural vegetation" was not maintained.

#6. Violation of Section 3.11.3.2.1.3 of the ZO: Undergrowth and ground cover less than three feet (3') in height was not maintained.

#8. Violation of Section 3.11.3.2.1.5 of the ZO: None of the trees removed were determined to be storm damaged, diseased or dead.

#10. Violation of Section 3.11.3.2.5 and Section 3.11.8.1 of the ZO: Any former cleared opening had reverted to primarily shrubs, trees, or other woody vegetation and must now be allowed to continue its regrowth and meet the requirements of Section 3.11.3.

4

#11. Violation of Section 3.9.7.1.3.2 of the ZO: The Land Use Table requires a permit from the CEO to clear vegetation in the Shoreland Overlay portion of the Special Residential Zoning District and such clearing must comply with Section 3.11.3.

## STANDARD OF REVIEW

In an appellate capacity, the Superior Court reviews a municipality's decision directly for errors of law, findings not supported by the evidence in the record, or an abuse of discretion. *Tenants Harbor Gen. Store, LLC v. Dep't of Envtl. Prot.*, 2011 ME 6, ¶ 8, 10 A.3d 722. The party asserting an error in a Rule 80B appeal bears the burden of showing that error before the court. *Quiland, Inc. v. Wells Sanitary Dist.*, 2006 ME 113, ¶ 16, 905 A.2d 806. A decision is supported by substantial evidence "when a reasonable mind would rely on that evidence as sufficient support for a conclusion." *Phaiah v. Town of Fayette*, 2005 ME 20, ¶ 8, 866 A.2d 863 (quotations omitted) (citing *Forbes v. Town of Southwest Harbor*, 2001 ME 9, ¶ 6, 763 A.2d 1183). The court may not substitute its judgment for that of the board, and may not determine that a board's decision is wrong "because the record is inconsistent or a different conclusion could be drawn from it." *Phaiah*, 2005 ME 20, ¶ 8, 866 A.2d 863.

A planning board's interpretation of an ordinance is a question of law that the court reviews de novo. *Aydelott v. City of Portland*, 2010 ME 25, ¶ 10, 990 A.2d 1024 (citing *Logan v. City of Biddeford*, 2006 ME 102, ¶ 8, 905 A.2d 293). The court must "examine the plain meaning of the language of the ordinance" and reasonably construe its terms "in light of the purposes and objectives of the ordinance and its general structure." *Stewart v. Town of Sedgwick*, 2002 ME 81, ¶ 6, 797 A.2d 27.

## DISCUSSION

### I. The Record to be Considered on Appeal.

Preliminarily, the Town objects to the Record filed by the Molinellis as not containing all the information that was before the BOA, and also including some information that was not before the BOA. In a Rule 80B action, "review shall be based upon the record of the proceedings before the governmental agency." M.R. Civ. P. 80B(f). If the agency's decision was based on a municipal ordinance, then a copy of the relevant sections must be included in the record. *Id.* (e)(2). If the parties cannot agree on the Record, then the dispute is submitted to the Court. *Id.*

First, the Town argues that the Record doesn't include some sections of the 2017 ZO that should have been included. The Molinellis do not object to the additional sections of the ZO being included.[3] Second, the Town argues that the Record includes documents that were not presented to, or referenced by, the BOA: the 2014 and 2016 ZOs. The 2016 and 2017 ZOs provide an exemption to the clearing and vegetation removal requirements. R. 324, 351. That exemption, section 3.11.8, provides that the vegetation removal standards set forth in section 3.11.3 do not apply to:

> [t]he removal of vegetation that occurs at least once every two (2) years for the maintenance of legally existing areas that do not comply with the vegetation standards in this chapter. . . . If any of these areas, due to lack of removal of vegetation every two years (2) reverts back to primarily woody vegetation, the requirements of Section 3.11.3 apply.

R. 324, 351. The 2014 ZO is silent on this exemption. The Town argues that because the BOA did not have the 2014 and 2016 ZOs before them, or even reference them during the

---

[3] The Supplemental Record shall consist of pages 394-409.

hearing or in their discussions, that they were not "before the governmental agency" as required by Rule 80B(f) and therefore should be excluded from the Record.

In response, the Molinellis argue that the ZO is relevant to the issue of grandfathering and vegetation reversion, which the BOA decided, and therefore the sections are required to be in the Record. The Molinellis make this assertion despite never arguing before the BOA that an earlier version of the ZO applied to these NOVs. The Town is correct that the earlier ZOs were not presented to, or referenced by, the BOA during the hearing or in its decision-making process. In fact, before the BOA, Attorney Pottle stated "I do want to point [sic] the reversion issue right now is a two-year time frame, it's not one year, it's two," R. 248, and then directed the BOA to the 2017 ZO. Although he did state that the issue has been ongoing since 2012, he never pointed to an earlier ZO as applicable to this dispute.

In *Boutet v. Town of Old Orchard Beach*, the Superior Court (York County, *O'Neil, J.*) was presented with a defendant's motion to strike documents from the record on a Rule 80B appeal. No. AP-15-8, 2015 Me. Super. LEXIS 250 at *1 (Oct. 16, 2015). The defendant contended that certain documents were not before the Planning Board as contemplated by M.R. Civ. P. 80B(e)(2), and therefore could not be part of the record on appeal per M.R. Civ. P. 80B(f). *Id.* at *2. Although the documents were not squarely before the Planning Board in its hearing, the court pointed out that the Board "drafted, considered, or was aware of each item in granting either the original approval in 1988 or subsequent amendments and relief to [] developers over the years." *Id.* at *3. The court determined that when read narrowly, the Rule would "strictly limit the record to evidence considered during the underlying proceedings a plaintiff appeals from." *Id.*

The court reasoned that the purpose of the Rule is to "limit the record to evidence that was actually considered by the Planning Board in rendering the decision under

7

review." *Id.* There, the court denied the motion to strike because it determined that it was necessary to interpret Rule 80B(e)(2) broadly because of the long and complex history of the development.[4] *Id.* at *3-4. The court allowed consideration of the "other related approvals, deeds, and other documents that have been submitted to, considered, and acted upon by the very same government agency—the Town Planning Board." *Id.* at 4.

In the case at bar, nothing indicates that the prior ZOs were submitted to, considered, or acted upon by the BOA. The Molinellis are instead trying to expand the Record to include support for a new argument that they assert before the Court, but that they never made before the BOA. This makes the instant case unlike *Boutet*. For these reasons, this Court will consider the additional sections of the 2017 ZO in the record as pages 394-409, but exclude pages 347-393, the older 2014 and 2016 ZO, from the Record.

II.     **NOV #10. Did the BOA Err in Determining that the Property Was Not Exempt Under Section 3.11.8.1 From the Requirements of the Shoreland ZO Because it Determined that the Property Had Reverted to Woody Vegetation Per Section 3.11.3.2.5?**

NOV #10 alleges violations of Shoreland ZO because the property had reverted primarily to woody vegetation before the Molinellis' 2017 cutting. According to sections 3.11.8 and 3.11.8.1:

> [t]he removal of vegetation that occurs at least once every two (2) years for the maintenance of legally existing areas that do not comply with the vegetation standards in this chapter, such as but not limited to cleared openings in the canopy or fields. Such areas shall not be enlarged, except as allowed by this section. If any of these areas, due to lack of removal of vegetation every two (2) years, reverts back to primarily woody vegetation,[5] the requirements of Section 3.11.3 apply[.]

---

[4] The Development was originally approved in 1988, was frequently before the Old Orchard Beach Planning Board, and was the subject of at least one other Superior Court case: *Dominator Golf LLC v. Pine Ridge Realty Corp. et al.*, No. CV-14-33, 2015 Me. Super. LEXIS 171 (July 8, 2015).

[5] "Woody vegetation" is defined by the ZO as "[l]ive trees or woody, non-herbaceous shrubs." R. 82.

8

Also listed in NOV #10 is section 3.11.3.2.5 which provides that "[f]ields and other cleared openings that have reverted to primarily shrubs, trees, or other woody vegetation shall be regulated under the provisions of section 3.11.3.2." NOV #6 is interrelated because it involves the required height of maintained vegetation. The Molinellis assert that the vegetation height was allowed to be lower than three feet because of their legally grandfathered easement. They also argue that because of their easement and continued maintenance they are exempt from the Shoreland ZO, so the height requirement laid out in the ZO does not apply to the ground cover that was cut below three feet. Pl.'s Br. 15.

The Molinellis generally argue that the BOA erred in finding that the understory and steep slope had reverted according to sections 3.11.8 and 3.11.8.1 of the ZO because the BOA erroneously failed to determine that the view easement area was grandfathered from the vegetation clearing requirements of the Shoreland ZO. Pl.'s Br. 14-15. In support of this general argument, the Molinellis advance three discrete arguments on appeal.

First the Molinellis argue that maintenance <u>has</u> occurred every year, except for the two years from 2015 through 2017 that they were working with the Town to try to find a suitable solution for themselves, the Wagners, and the Town. Pl.'s Br. 15-16. They state that this two-year lull in maintenance cannot amount to abandonment of their view easement because they always had the intent to maintain it. Pl.'s Br. 15-16. Second, and an argument that they did not raise before the BOA, is that their 2017 maintenance <u>did</u> fall within the two year exemption window because the provision did not exist in the ZO until May 2, 2016, and should apply prospectively.[6] Finally, the Molinellis assert that even

---

[6] Similarly, the Molinellis also progress a "calendar year" argument – that because the provision was enacted in 2016, the Molinellis could qualify for the exemption so long as they did any

9

if they did not conduct maintenance activities within the two year exemption window, that it is irrelevant because the section contemplates a twofold "if-then" analysis: (1) if the vegetation removal did not occur within two years, then (2) determine whether the area actually reverted back to woody vegetation. Pl.'s Br. 18-19. The Molinellis argue that the BOA only considered the first step of the two-part analysis.

In response, the Town first stresses the deferential standard of review that must be applied to the Board's factual finding that the areas had reverted. It then points to documentary evidence and oral testimony in the record that it claims shows that those areas reverted as early as 2013 and that the Town consistently maintained that position through 2015. Def.'s Br. 12-14. The Town further contends that the Molinellis new arguments regarding the effective date of the provision fail because: (1) they are waived because they could have been presented to the BOA but were not, and (2) they were already on notice that the property had reverted before the May 2, 2016, effective date of the provision, and; (3) it would not be reasonable to apply the reversion start date as of May 2, 2016. Def.'s Br. 14-15.

### A. The Molinellis' Argument that They Intended to Maintain Their View Easement.

The Molinellis argue that maintenance occurred every year except for when the Town prohibited it and that because they always intended to maintain their easement, their property should still be considered exempt from the clearing/removal provisions of the ZO. In support of their argument, they offer *Henner v. Inhabitants of Glenburn*, No. CV-89-452, 1990 Me. Super. LEXIS 222 (Oct. 24, 1990). In that case, the plaintiff owned a seasonal cottage in the Shoreland Zone that the Town of Glenburn claimed was a

---

maintenance within the 2016 or 2017 calendar year. Again, this is an argument that was not advanced before the BOA.

nuisance or dangerous. *Id.* at *1-2. To bring the cottage into compliance, the plaintiff applied for a plumbing permit from the Town's CEO, as required by the ZO. *Id.* at *2. The CEO decided that the plaintiff was applying for a renewal of a nonconforming use because she has not occupied her cottage for over 12 months. *Id.* at *3. Because of the non-use, her application was treated as a request for a variance by the BOA, which had jurisdiction over changes in nonconforming uses. *Id.* at *2-3. The Superior Court (Penobscot County, *Silsby II, J.*) held that "[i]t was an error of law to determine that more than 12 months non-occupancy was an abandonment or discontinuance of the use of the property as a seasonal cottage." *Id.* The Court reasoned that while sometimes "a non-occupancy over a period of time may be a factor in the discontinuance of a use, by itself it is not sufficient." *Id.*

Generally, abandonment is a voluntary, affirmative act that includes a clear intent to give up ownership. *Lewis v. Me. Coast Artists*, 2001 ME 75, ¶ 15, 770 A.2d 644. "Non-use, even for lengthy periods of time, is, of itself, insufficient to show an abandonment of a right especially where the acts manifest an intent contrary to abandonment." *Lewis v. Me. Coast Artists*, 2001 ME 75, ¶ 15, 770 A.2d 644 (internal quotations omitted). The party claiming abandonment of property by its opponent has the burden to prove intent to abandon and actual abandonment. *Lewis v. Me. Coast Artists*, 2001 ME 75, ¶ 15, 770 A.2d 644.

Here, although the Molinellis advanced this argument before the BOA, it did not consider the Molinellis' intent to maintain their view easement,[7] and instead decided that the view easement is irrelevant when it comes to compliance with the ZO, R. 315, and

_____

[7] Their intent to maintain the easement is clear. They had hired a forester, had been working on VMPs, and clearly told the Wagners that they intended to maintain the easement. They hired legal counsel years before this suit occurred for the purpose of protecting the view easement.

11

solely focused on the lack of maintenance from September 2015 through November 2017. R. 316. At the hearing, one board member pointed out that the Molinellis were not doing any cutting at the direction of the Town, because they were threatened with NOVs if they maintained the property. R. 285. Despite this, the BOA focused solely on the two-year time frame that no cutting occurred, and without giving any weight to the reason why, voted by a majority that the property had reverted. R. 316.

The Town does not attempt any argument against the fact that it was their actions that caused the just-over two-year lapse in maintenance, but, instead it is the Town's position that the property had reverted before the two-year lapse in maintenance. In CEO Dunlap's April 2016 letter to the Molinellis attorney, he stated that the property had already reverted because Judith Molinelli submitted an affidavit that referred to saplings one to two feet tall, which would take two to four growing seasons to reach that height. R. 114. Although no provision existed in the ZO regarding reversion at that time,[8] the ZO was modeled off DEP's regulations, and the DEP informed CEO Dunlap that land was considered reverted if not maintained for more than 12 months. R. 114. CEO Dunlap reasoned that two to four growing seasons was more than 12 months, thus, the property had reverted and had to be maintained within the Shoreland ZO guidelines.

The Molinellis have the better argument. They attempted to work with the Town, even if not always harmoniously, for years regarding the maintenance of their view easement. When CEO Dunlap stated that all future plans for cutting had to be approved by his office, the Molinellis caused a total of three VMPs to be produced and submitted. Further, it appears that it was within the BOA's power to determine whether the property reverted, not within the CEO's power. As the Molinellis argue, if the Town were prevail

---

[8] The two-year reversion provision was adopted in the May 2016 ZO.

12

in this strict reading of the ZO, it would discourage property owners from working with the Town in the future. The Town could essentially weed out all nonconforming uses by ordering that they not occur until certain requirements are met, never approving the requirements despite an effort by the landowner to comply, and waiting for two years to pass, thereby removing the property from the exemption provision of the ZO.

Therefore, this Court determines that the BOA made an error of law, or alternatively, abused its discretion, in determining that the view easement, and the Molinellis intent to maintain it, did not have an impact on their determination of reversion under the given circumstances. Because of this, the BOA's decision to uphold NOV #10 is reversed and vacated.[9]

i.     **NOV #6. Did the BOA Err in Upholding a Violation of Section 3.11.3.2.1.3, of the ZO: Undergrowth and Ground Cover Less Than Three Feet (3') in Height Was Not Maintained?**

NOV #6 pertains to whether vegetation under three feet in height was cut. The Molinellis' view easement provides that "no vegetation [will be] allowed to grow so as to interfere or block the view of the Sheepscot River." As immediately discussed prior, the BOA made an error of law, or abused its discretion, in determining that the property reverted when it did not take into account the Molinellis' view easement, or why the Molinellis did not conduct maintenance for that two year period. Because the Court is reversing and vacating the BOA's decision to uphold NOV #10, NOV #6 is also reversed and vacated. If the property did not revert, it would not be a violation to maintain vegetation less than three feet in height.

---

[9] Because the Court is reversing and vacating the BOA's decision to uphold NOV #10 (and NOV #6 as discussed below) there is no need to address the Molinellis' argument that the exemption provision of the ZO should apply prospectively, which the Town argues is waived, or the Molinellis' assertion that the exemption provision requires a two-part analysis.

13

### III. NOV #1. Was a Licensed Forester Necessary to Determine What Vegetation Could be Removed Pursuant to Section 3.11.3.2.1 of the ZO?

The Molinellis argue that the BOA erred as a matter of law in interpreting the ZO to require a licensed forester for regular maintenance of vegetation on the property, and not just for maintenance that involves safety hazards. Pl.'s Br. 9-10. Section 3.11.3.2.1 states that

> [e]xcept to allow for the development of permitted uses and the removing of safety hazards specifically identified and marked by a Maine licensed forester, a buffer strip of vegetation shall be preserved within a strip of land extending 100 feet from the shoreline of a great pond and 75 feet from any other shoreline.

In response, the Town thinly argues that because at least one tree was cut, and it was not identified as a hazard tree, that no one can make a hindsight determination of whether the tree was a hazard tree that would have needed to be identified by licensed forester before being cut.[10] Def.'s Br. 16-17. They do not argue the Molinellis' interpretation of the ZO, but instead rely on the deferential review that courts give to a BOA's decision. The Town asserts that because no one knows whether the tree was a hazard, that this record does not compel a contrary finding.

A factfinder's interpretation of a ZO's requirements is reviewed de novo. *Bizier v. Town of Turner*, 2011 ME 116, ¶ 14, 32 A.3d 1048. A ZO is examined for its plain meaning and its terms are construed reasonably "in light of the purposes and objectives of the ordinance and its general structure." *Id.* When an ordinance is "clear on its face" the court

---

[10] "Safety hazard" is not defined by the ZO, but a "hazard tree" is

> a tree with a structural defect, combination of defects, or disease resulting in a structural defect that under the normal range of environmental conditions at the site exhibits a high probability of failure and loss of a major structural component of the tree in a manner that will strike a target.

R. 334-35. Trees that pose a serious and imminent risk to bank stability are hazards, and "target" is further defined by the ZO. R. 334-35.

14

need look no further than its plain meaning. *Id.* Although interpretation of an ordinance is a question of law, the court accords substantial deference to the fact finder's characterizations and determinations as to what meets a ZO's standards. *Id.* ¶ 8.

Here, the BOA made no findings of fact that indicate a safety hazard existed, just that the Molinellis did not use a licensed forester. R. 315, ¶ 9. This ZO, as the Molinellis argue, is clear on its face. Worded differently, but still keeping the same meaning, the ZO provides that a buffer strip of vegetation must be preserved, except in two situations: (1) to allow for the development of permitted uses and (2) when a safety hazard that has been specifically identified and marked by a licensed forester must be removed.

The BOA incorrectly interpreted its own ZO to mean that a licensed forester must be used for any maintenance activities, not just for identifying and removing hazards, which is an error of law. It made no factual findings that a hazard existed (or even might have existed) that would have required the use of a licensed forester. Because of this, the BOA's decision to uphold NOV #1 is reversed and vacated.

IV.    **NOV #8. Did the BOA Err in Upholding the Violation of Section 3.11.3.2.1.5: None of the Trees Removed Were Determined to be Storm Damaged, Diseased, or Dead?**

In its entirety, section 3.11.3.2.1.5 of the ZO provides that

> [i]n order to maintain a buffer strip of vegetation, when the removal of storm-damaged, diseased, unsafe, or dead trees results in the creation of cleared openings, these openings shall be replanted with native tree species unless existing new tree growth is present.

R. 322. The Molinellis first argue that no "trees," as defined by the ZO, were cut, except for possibly one, which the BOA found after its site visit.[11] Pl.'s Br. 11. They further argue

---

[11] According to the ZO, a tree is "a woody perennial plant with a well-defined trunk(s) at least two (2) inches in diameter at four and one half (4.5) feet above the ground, with a more or less definite crown, and reaching a height of at least ten (10) feet at maturity."

15

that for this section of the ZO to apply, there must be a storm-damaged, diseased, unsafe, or dead tree that is subsequently removed. Next, they contend that if one of these trees was determined to have existed and then been removed, this section of the ZO still does not apply unless a cleared opening was created, which the BOA expressly rejected as it did not uphold NOV #2: a cleared opening in the forest canopy exceeded two hundred fifty square feet. Pl.'s Br. 12.

The Town does not address whether the tree that was cut was storm damaged, dead, diseased, or unsafe, or whether its removal created a cleared opening.[12] In fact, they do not address this NOV in any specific way, but instead lump it together with NOVs #1, #4, and #5.[13] However, giving the Town the benefit of the doubt because of the deferential level of review that must be applied by this Court, its argument about hazard trees could apply to this NOV. The BOA did find that at least one tree had been cut, but made no determination regarding whether it was a hazard tree. Def.'s Br. 17. The Town further argues that the Molinellis have not shown that the Record evidence compels a contrary finding.

It is important that the BOA did not uphold NOV #2.[14] In reversing that NOV, it determined that there were no cleared openings in the forest canopy. R. 317. Also, during discussions, at least some of the BOA members stated that they did not see a cleared opening of 250 feet. Because of the Town's lack of argument on this NOV, the lack of

---

[12] "Cleared opening" is not defined in the ZO, but section 3.11.3.2.1.1 provides that no cleared openings bigger than 250' may exist in the Shoreland Zone.

[13] As will be discussed below, this Court finds the Town's arguments regarding NOVs #4 and #5 unconvincing.

[14] NOV #2. Violation of Section 3.11.3.2.1 of the ZO: Cleared openings in the forest canopy exceeded two hundred fifty square feet (250 sq. ft.).

16

findings about any damaged trees that would qualify as a violation of this subsection, and the express rejection of any cleared opening, the evidence <u>does</u> compel a contrary result. This is not merely an inconsistency in the record, but instead a total lack of evidence that would be required for the BOA to uphold a violation of this section. The Court reverses and vacates the BOA's decision to uphold NOV # 8.

## V. NOV #4 and #5. Was the BOA Correct in Upholding Violations of Subsections of the Shoreland Overlay Zone and Watershed Overlay Zone After It Declined to Uphold NOV #3?

The Molinellis argue that NOVs #4, section 3.11.3.2.1.2.1 of the ZO, and #5, section 3.11.3.2.1.2.2, cannot stand because they are merely subsection definitions of NOV #3, section 3.11.3.2.1.2, which governs requirements for the selective cutting of trees within the buffer strip.[15] Def.'s Br. 13. They argue that NOVs #4 and #5 are reliant on the upholding of NOV #3, which the BOA declined to do. Def.'s Br. 13.

In response, the Town asserts that the Molinellis have not shown that the evidence in the record compels a contrary finding because at least one tree was cut and there is no dispute that other natural vegetation was cut. Def.'s Br. 16-17. Like NOV #1, the sections of the ZO that are the foundation of NOV #4 and NOV #5 are clear on their face. It is easiest to see this clarity by viewing the sections of the ZO that were allegedly violated as a whole. Page 56 of the Record shows these sections as they appear in the ZO.

Viewing the subsections that are the bases for NOV #4 and #5 against the ZO as a whole, it is clear that the Molinellis are correct in their argument. The Board did not uphold NOV #3 regarding the selective cutting of trees. The sections that NOVs #4 and #5 are based upon are clearly explanatory subsections to NOV #3 because they are both

---

[15] NOV #3. Violation of Section 3.11.3.2.1.2 of the ZO: Selective cutting was not followed and a "well distributed stand of trees" was not maintained.

17

below and indented from the parent section, and define terms found in the parent subsection. Further, the sequential numbering of the NOVs indicate that #4 and #5 are subsets of NOV #3. Although it is slightly confusing because of all the periods in the ZO, no one would seriously argue that sections 3(11)(3)(2)(1)(2)(1) and 3(11)(3)(2)(1)(2)(2) were not subsections of 3(11)(3)(2)(1)(2). Therefore, NOVs #4 and #5 cannot stand because they are mere subsections of NOV #3 that the BOA declined to uphold.

The BOA misinterpreted a part of the ZO that was clear on its face by finding that there could be violations of subsections of the selective cutting of trees after it determined that no selective cutting of trees occurred, and declining to uphold NOV #3 relating to the cutting. This is an error of law. The Court reverses and vacates the BOA's decision to uphold NOVs #4 and #5.

VI.    **NOV #11. Did the BOA Err in Upholding the Violation of Section 3.9.7.1.3.2 That a Permit Was Required and That Any Clearing Had to Comply With the Clearing and Removal Requirements of Section 3.11.3?**

Section 3.9.7.1.3.2, the basis for NOV #11, is a land use table that shows the clearing of vegetation requires a permit in Shoreland Overlay Zones, and that section 3.11.3, Clearing and Removal of Vegetation in the shoreland zone, provides supplemental standards. Supp. R. 397-98. The Molinellis argue that they should not have been required to obtain a permit because they were clearing vegetation in compliance with  the exemption sections 3.11.8 and 3.11.8.1. Pl.'s Br. 15. Together, those sections provide that the requirements of 3.11.3 do not apply to the removal of vegetation occurring at least once every two years to maintain legally existing nonconforming areas.[16] The Molinellis

---

[16] The Molinellis attempt to categorize their clearing activity as involving storm damaged, dead, or diseased trees, because then, under certain circumstances, no permit is required per section 3.11.7.1.3 to remove them. However, this argument is purely speculative and meritless. As they argued before, there is no way to make a hindsight determination of whether a tree was a hazard

argue, but provide no cite to the ZO, that because they have a legally grandfathered view easement over the area, they are exempt from obtaining a permit for maintenance of the easement due to 3.11.8 alone.

The Town argues for a plain reading of the land use table and the ZO as a whole. Def.'s Br. 11-12. The land use table is clear that a permit is required to remove vegetation in a Shoreland Zone. Vegetation is defined in the ZO as "[a]ll live trees, shrubs, and other plants including without limitation, trees both over and under 4 inches in diameter, measured at 4 1/2 feet above ground level." R. 345. The Town correctly asserts that the Molinellis' did not obtain a permit for the November 2017 clearing, and that there was clearly vegetation removed. R. 223-24, 226. The Town refutes the Molinellis' assertion that they are exempt from obtaining a permit for maintenance of the view easement because nothing in the land use table (which supplies the permit requirement), or the section of the ZO providing the exemption from compliance with section 3.11.3, state that no permit is required for such maintenance.

This Court reviews the interpretation of a ZO de novo, but looks to the plain meaning of the ZO and strives to construe its terms "reasonably in light of the purposes and objectives of the ordinance and its general structure. *Stewart v. Town of Sedgwick*, 2002 ME 81, ¶ 6, 797 A.2d 27. The Town has the stronger argument on NOV #11. The BOA made findings of fact that no permit was obtained for the 2017 clearing and that none of the Molinellis' proposed Vegetation Maintenance Plans were approved. R. 315. It decided

tree in this case. Also, the Molinellis did not argue before the BOA that the one tree that the BOA determined to be cut was affected by any of those conditions. If anything, section 3.11.7.1.3 shows that the Town knew how to exempt certain types of clearing from the permit requirement in the land use table and chose not to exempt the removal of vegetation from legally existing nonconforming areas from the permit requirement.

19

to uphold most of the NOVs, including #11, based at least in part on "the lack [of] a permit for any of the clearing activity." R. 317.

Although the BOA did not explicitly spell out its reasoning for upholding NOV #11, there is relevant evidence in the Record to reasonably support its conclusion. Had the town wished to not require a permit for exempt maintenance it could have indicated so in section 3.11.8.1, just as it did with certain hazard trees in section 3.11.7.1.3. However, it did not. Although section 3.11.8 provides that specific activities are exempt from the clearing and vegetation removal standards set forth in section 3.11.3, this does not necessarily equate to being exempt from the permit requirements set forth in land use table in the different section of 3.9.7.1.3.2. Because there is substantial evidence in the Record to support the BOA's decision to uphold NOV #11, this Court will not disturb that decision.

## CONCLUSION

In coming to its conclusion, the Court considered the additional sections of the 2017 ZO contained in 394-409 of the Supplemental Record, but did not consider pages 347-393. The Court denies the Plaintiffs' Rule 80B appeal regarding NOV #11. The Court grants the Plaintiffs' Rule 80B appeal and reverses and vacates the decision of the BOA relating to NOVs #1, #4, #5, #6, #8, and #10.

The Clerk is requested to enter this Order on the docket for this case by incorporating it by reference. M.R. Civ. P. 79(a).

Dated: February 4, 2019

Daniel I. Billings, Justice
Maine Superior Court

20